UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AMBROSE WILBANKS, JR.,

    Plaintiff,

v.                                                                                        Case No. 16-10157

YPSILANTI COMMUNITY SCHOOLS,                   HON. AVERN COHN
YPSILANTI COMMUNITY SCHOOLS BOARD
OF EDUCATION, DR. BENJAMIN EDMONDSON,
AARON ROSE and DONALD WOOD,

    Defendants.

_____/

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT, (Doc. 16)**

**I.     INTRODUCTION**

This is an employment retaliation case. Ambrose Wilbanks, Jr. (Wilbanks), a former special needs teacher at Ypsilanti Middle School, is suing the school district, Ypsilanti Community Schools, for wrongful termination.

Wilbanks also names as defendants the school board—Ypsilanti Community Schools Board of Education—and school officials. They are: (1) Aaron Rose, Principal of Ypsilanti Middle School; (2) Dr. Benjamin Edmondson, the district's Superintendent; and (3) Donald Wood, the district's Human Resources Director.

**A.     The Case**

Wilbanks says defendants retaliated against him for complaining to Rose and others at Ypsilanti Middle School of the school's failure to provide mandated services to

students with disabilities. He claims retaliation under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*, and Rehabilitation Act, 29 U.S.C. § 701 *et seq.*

Defendants say Wilbanks was terminated for twice using physical force against students, PH and DH. Rose referred the incidents to Wood for investigation. Wood recommended termination to the school board. After a meeting, the board accepted the recommendation and terminated Wilbanks.

### B. Pending Motion

Defendants have filed a motion for summary judgment, (Doc. 16), to which Wilbanks responded, (Doc. 20), and defendants replied, (Doc. 22).

### C. Supporting Exhibits

Attached to the statements of fact are (1) e-mails from Wilbanks to officials at Ypsilanti Middle School and to the school board president, (Doc. 20-1 at 25-32, 35-36; Doc. 17-6 at 7, 12); (2) videos of the two incidents, (Doc. 17-9); (3) an affidavit of Wilbanks, (Doc. 20-1 at 63-65); (4) disciplinary records of PH and DH, (Doc. 20-1 at 20-24);[1] (5) district policies on use of force, (Doc. 20-1 at 62, 109-10); (6) documentation of Wood's investigation and termination charges, (Docs. 17-11 to 17-14); (7) the school board's findings and decision, (Docs. 17-15, 17-17); and (8) depositions of Wilbanks, Rose, Edmondson and Wood, (Docs. 17-3, 23-3 to 23-5).

---

[1] PH and DH had extensive disciplinary records. PH had threatened a teacher and hit peers. DH had hit peers and teachers. Each had infractions for insubordination, disrespect and disruption. DH had been charged with endangering others.

2

### D.  Motion Hearing and Supplementation of the Record

On June 14, 2017, the Court held a hearing on the motion after which the parties supplemented the record relating to the school board meeting, (Docs. 24, 25). The attached exhibits include,

- correspondence between Wilbanks's counsel and school district counsel in advance of the school board meeting, (Doc. 24 at 6-7, 11, 16-18);

- an affidavit of Wilbanks's counsel regarding the meeting, (*id.* at 8-10);

- an affidavit of Wilbanks regarding the meeting, (*id.* at 12-15);

- an affidavit of Wood regarding the meeting, (Doc. 25-4); and

- an affidavit of the school board president regarding the meeting, (Doc. 25-5)

### E.  Disposition

A school district may not terminate a teacher because the teacher advocates for pupils with disabilities. If school officials recommend termination with this motivation, and succeed, the school district may be liable even if the school board which accepted the recommendation acted unwittingly. After accusing the administration of failing to follow the law, Wilbanks was seen on video twice using force against a student. The school board terminated him at a meeting days after a recommendation by Wood, who investigated the matter on the report of Rose on the incident.

The question to be answered is cannot one reasonably infer that Wilbanks was terminated because of his complaints, and that his use of force was a pretext for retaliation? The Court finds the answer is no.

3

Defendants' motion for summary judgment, (Doc. 16), is GRANTED and the case is DISMISSED.[2]

## II.    FACTS

### A.    Hiring and Promotion

Wilbanks was hired by the district in 2007 as a teacher's aide. In 2013, he was promoted to special needs teacher in a classroom at Ypsilanti Middle School. He did not have tenure.

### B.    Complaint to Administration

Wilbanks began the 2015-2016 year complaining to administration regarding the services available to his pupils and the state of his classroom.

In an e-mail from Wilbanks dated September 8, 2015 to his supervisor, a special education administrator, and an executive secretary, Wilbanks accused the school district of failing to provide "appropriate" education for pupils by removing them from general education settings, and of ignoring individualized education programs (IEPs) which called for aides to assist Wilbanks (there were none). (Doc. 20-1 at 27).[3] Wilbanks asserted this was a "violation of . . . federal law." (*Id.*).

Wilbanks met the next day with the special education director, who temporarily reassigned an aide from another classroom to address Wilbanks's concerns. (*Id.* at 28). Wilbanks followed up with an e-mail that day confirming the meeting and adding Rose

---

[2] Wilbanks's motion to compel discovery, (Doc. 13), is DENIED. The Court reviewed the records *in camera*. They do not alter the outcome.

[3] There is no evidence in the record of Wilbanks's communications reaching members of the school board or of coming to the attention of Edmondson or Wood, except for Wilbanks's October 20, 2015 e-mail to the school board president.

to the e-mail chain.  In his e-mail, Wilbanks reiterated the "absence of any [aides]" in his classroom and that this conflicted with "[a]ny cursory review of the number of students on [his] caseload[] or the needs contained in the IEP's of these children." (*Id.*).

The same day, Rose responded to Wilbanks: "This is good news regarding [the reassigned aide]  Thanks for advocating for your programs and students  I support your efforts and will push whenever possible."  (Doc. 17-16 at 7).

### C.     Incident 1 (PH) – September 14, 2015

**1.**

On September 14, 2015, PH had been sent into the hallway from his art classroom for being disruptive.  Wilbanks saw PH roaming the hallway unattended.

**2.**

It is against school policy for students to wander a hallway unattended. (Doc. 20-1 at 61).  Policy permits teachers to use reasonable force to "remove a student who refuses to comply with a request to behave or report to the office." (*Id.* at 62).

**3.**

The video depicts PH shouting in the direction of Wilbanks, his hands animated. PH turned and walked to the classroom door where others had congregated.  Wilbanks approached from behind.  PH turned and walked up to Wilbanks.

In deposition, Rose described the events leading to the encounter, based on his conversations with Wilbanks and PH and after reviewing the video (*see* below), as, (Doc. 23-4 at 48-49),

> "Mr. Wilbanks described PH's behavior as loud, inappropriate for the hallway and the learning environment.  Disrespectful may have been a term that described his behavior, certainly his response to Mr. Wilbanks asking

5

him to be quiet and quiet down. Basically just shrugged him off and kept doing what he wanted to do and PH acknowledged that and owned that.

Mr. Wilbanks followed him, asking his name, what he was doing, that sort of thing. To my knowledge PH didn't respond as he should have to the adult . . . and they had some exchange."

### 4.

The video depicts PH trying to sidestep Wilbanks. In response, Wilbanks moved his body to block PH from getting by. Every time PH attempted, Wilbanks repositioned and blocked him. PH bolted. Wilbanks grabbed PH by the torso as he ran. The inertia of the two led PH to crash into the wall, where Wilbanks cornered PH.

### 5.

PH went to Rose after the incident and told him Wilbanks "put his hands on me." (*Id.* at 48). In a written statement prepared as he viewed the video afterward, Rose described the incident as, (Doc. 17-11 at 2),

"Mr. Wilbanks stood in front of PH and continued to block his attempts to walk down the hall away from the incident. Mr. Wilbanks walked back and forth continually blocking PH from leaving the incident. PH attempted to run past Mr. Wilbanks and was blocked against the wall. It appears that Mr. Wilbanks makes physical contact with PH against the wall. PH gets upset and the incident escalates."

### 6.

Rose testified he met with Wilbanks several days after and told him "this can't ever happen again. You can't put your hands on students." (Doc. 23-4 at 52).

### D. Complaints

In an e-mail from Wilbanks dated September 24, 2015 to Rose, Rose's secretary, and the assistant principal, Wilbanks said the lack of aides in his classroom created "potential dangers and liabilities." (Doc. 20-1 at 31). Further, (*id.*),

6

> "Just this week, I have had students walk out of the building, refuse to attend classes and get in fights when I have been by myself, creating situations where I physically could not manage getting the majority of class to a safe, neutral environment while I handled the problem at hand."

In an e-mail from Wilbanks dated September 25, 2015 to his supervisor, Rose, and the special education director, Wilbanks said he had met with Rose and conveyed "we have passed a very dangerous line with the lack of support in my room." (*Id.* at 32). In the e-mail, Wilbanks mentioned a "fear of litigation" and stated, (*id.*),

> "Students who refuse to follow directions, walk out of class, roam the halls, incite violence and intimidate others have . . . created situations which are dangerous for these students and those they come in contact with."

### E. Incident 2 (DH) – October 2, 2015

#### 1.

DH was a student of Wilbanks. On October 2, 2015, in Wilbanks's classroom, DH refused to get out of a "rolling" chair and left the room without permission. After re-entering and "banging" puzzles, DH threatened to start "tearing up" other items. Wilbanks told DH to leave the room. He did.[4]

Wilbanks went to search for DH, he said because DH was at risk of harming himself or others. (Doc. 20-1 at 64-65). A video depicts Wilbanks meeting DH on a staircase where he stood in front of him, blocking DH from returning to the classroom.

DH left and Wilbanks followed, seeing DH exit the hall by a door to a stairwell. The stairwell video depicts Wilbanks grab DH by the arm and pull him into the hall.[5]

---

[4] This is from Rose's recitation at his deposition of notes he took interviewing a student from the classroom who witnessed the incident. (Doc. 23-4 at 112-14).

[5] Wilbanks told Rose DH repeatedly hit him as he grabbed his arm. (Doc. 23-4 at 66-67). This is not reflected on the video.

7

**2.**

Under school policy, teachers may use reasonable force against a student to "quell a disturbance threatening physical injury to self or others." (Doc. 20-1 at 62).

**3.**

DH came to Rose after and told him his shoulder hurt from Wilbanks twisting his arm and he heard something in his arm snap. (Doc. 23-4 at 59-60).

**4.**

The incidents involving Wilbanks, PH and DH thereafter came to the attention of Wood. The record does not disclose who referred the incidents to Wood, though presumably it was Rose as he was the responsible official with knowledge of them.

**F.     Administrative Leave and Wood Investigation**

Wood sent Wilbanks a memorandum dated October 9, 2015. (Doc. 17-12 at 2). The memorandum informed Wilbanks he was placed on administrative leave effective October 8, 2015, and of an investigation into the two incidents. (*Id.*).

Wood testified the investigation consisted of reviewing the videos of each incident and a written statement that Rose prepared after viewing the videos, and of interviewing Wilbanks. (Doc. 23-3 at 21-22). Wood did not interview students or parents, and was not aware of PH or DH's disciplinary record. (*Id.* at 22, 25-26).

Wood signed all documents relating to the investigation, but testified that a law firm drafted them and did most of the investigative work. (*Id.* at 19-20, 52).

**G.     Wilbanks's E-Mail to President of the School Board**

On October 20, 2015, Wilbanks e-mailed the president of the school board, Edmondson, and Wood. (Doc. 20-1 at 35-36). After describing the incidents, Wilbanks

said the lack of aides in his classroom violated state law. Wilbanks noted he had voiced the issue to administration and "been a team player" in seeking a resolution. (*Id.*).

### H. Counsel Retained

Wilbanks retained counsel. Counsel sent a letter to Wood dated October 29, 2015. (Doc. 24 at 17-18). The letter stated "[Wilbanks] has retained me with respect to his employment at YCS Middle School. As such I am requesting that all further communication go through my office." (*Id.* at 17).

### I. Termination Charges and Notice of School Board Meeting

Wood sent Wilbanks a letter dated November 3, 2015 declaring his intent to file charges of termination, enclosed,[6] with the school board. (Doc. 17-13 at 2-3).

The letter informed Wilbanks that the charges would be considered at a meeting of the school board on November 9, 2015. (*Id.* at 2). The letter stated,

> You will have the right to be accompanied by a Union representative, to hear the evidence against you, to present contrary evidence through documents or witness testimony, and to convey to the Board your position regarding the proposed outcome.

The letter gave Wilbanks the option of a meeting in closed session. Further, (*id.*),

> The Board will receive the termination charges in a Board packet before the meeting. You and/or your representative may file a written response. . . .
>
> If you request a closed session, the charges and any responsive material you submit will be considered in a closed session before any determination is made regarding your employment.

A copy of the letter and charges was not sent to Wilbanks's counsel. Wilbanks testified he gave the letter to his counsel. (Doc. 17-3 at 85).

---

[6] The charges stated Wilbanks had violated school policy by using force against PH and DH and "escalating" the situation "unnecessarily." (Doc. 17-14 at 2-3).

9

### J.     E-Mail Correspondence between Counsel

In an e-mail dated November 6, 2015 to the school district counsel, Wilbanks's counsel said, (Doc. 24 at 7),

> "I am requesting that any charges filed against [Wilbanks] are furnished to Mr. Wilbanks and my office. Also, I would appreciate if you could advise me when the board will be considering the charges. I have spoken to my client and will be representing him in any proceedings before the board.
>
> . . . I would ask that you consider holding off on any board action to allow the parties time to reach a resolution."

The next day, district counsel attached the documents and responded, (*id.* at 6),

> "During our conversation last Tuesday, you stated you would not be representing Mr. Wilbanks before the Board. Accordingly, you were not copied.
>
> . . . [Wilbanks] is receiving only an informal hearing before the Board . . . . Although Mr. Wilbanks may address the Board and present evidence, this is more of a report to the Board than a trial or formal hearing.
>
> Please let me . . . know whether you would like this hearing to occur in closed session."

On the day of the meeting, Wilbanks's counsel replied, (*id.* at 16),

> "We are requesting a closed session. Also, I would renew my request to see the video prior to the meeting. I certainly can come early to view it."

### K.     School Board Meeting

There are no documents in the record from the school board meeting on November 9, 2015. There is no transcript, agenda, witness or exhibit list, or minutes.

Wilbanks testified in deposition that,

- He, his counsel, and a union representative were present at the closed meeting, (Doc. 17-3 at 83-84);

- The video was played and Rose was the only witness, (*id.* at 76, 84-85);

- His counsel did not cross-examine Rose, (*id.* at 86); and

10

- His counsel made an oral statement on his behalf at the end of the meeting (before voting) but did not file any papers, call any witnesses, or introduce any evidence, (*id.* at 84-85).

Wilbanks's counsel stated by affidavit that she viewed the videos for the first time five minutes before the meeting. (Doc. 24 at 9).

The school board president stated by affidavit, (Doc. 25-5 at 3-4),

- I reviewed the email sent by Mr. Wilbanks dated 10-20-15;

- The content of the email did not have any impact on my vote;

- I voted to terminate Mr. Wilbanks because he had two situations (9-14-15 & 10-2-15) where he assaulted two different students on school property and in violation of the YCS policies;

- I viewed video of both events involving Mr. Wilbanks and the students;

- Mr. Wilbanks had a full hearing and was free to present any evidence that he felt appropriate at the Board Meeting on November 9, 2015;

- That the video was played for the board; and

- Mr. Wilbanks was represented by counsel at the meeting.

At the meeting, the school board adopted a resolution to terminate Wilbanks for the "described misconduct," which stated, (Doc. 17-17 at 2),

- The Board has been advised by its administration of the basis of the termination charges, has heard evidence regarding them, and has deliberated as to whether to proceed upon the recommendation to terminate Mr. Wilbanks' employment, and

- Mr. Wilbanks has been given full opportunity to present evidence and argument on his own behalf regarding the termination charges.

A letter dated November 10, 2015 contained the decision of termination. (Doc. 17-15).

### III. SUMMARY JUDGMENT

Summary judgment will be granted if the moving party demonstrates that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is no genuine issue of material fact when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *In re Dollar Corp.*, 25 F.3d 1320, 1323 (6th Cir. 1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). In doing so, the Court "must view the evidence in the light most favorable to the non-moving party." *Emp'rs Ins. of Wausau v. Petrol. Specialties, Inc.*, 69 F.3d 98, 101 (6th Cir. 1995).

### IV. RELEVANT LAW

#### A. Retaliation

"A *prima facie* case of retaliation has four elements: 1) the plaintiff engaged in legally protected activity; 2) the defendant knew about the plaintiff's exercise of this right; 3) the defendant then took an employment action adverse to the plaintiff; and 4) the protected activity and the adverse employment action are causally connected." *Gribcheck v. Runyon*, 245 F.3d 547, 550 (6th Cir. 2001).

The ADA forbids a school discriminating against a student based on disability in the provision of public education, 42 U.S.C. § 12182(a), as does the Rehabilitation Act, 29 U.S.C. § 794(a). The Rehabilitation Act obliges a school to provide free, appropriate public education (FAPE) to students with disabilities. 29 U.S.C. § 701(c).

An employer may not retaliate against an employee by discharging him because he "opposed any act or practice made unlawful by [the ADA]." 42 U.S.C. § 12203(a). The Rehabilitation Act incorporates this anti-retaliation provision. 29 U.S.C. § 794(d).

### B. Burden-Shifting Framework

A retaliation claim under the ADA and Rehabilitation Act is governed by the "familiar" burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Gribcheck*, 245 F.3d at 550.

"First, a plaintiff must set forth a *prima facie* case of discrimination." *Id.* (citation omitted). "The burden then shifts to the employer to articulate some legitimate, nondiscriminatory reason for its actions." *Id.* (citation omitted). "If the defendant carries this burden, the plaintiff must then prove by a preponderance of the evidence that the reasons offered by the employer were a pretext for discrimination." *Id.* (citation omitted). "The ultimate burden of persuasion remains at all times with the plaintiff*." Id.* (citation omitted).

### C. Causation

#### 1. Inferring Causation

A plaintiff may establish a causal connection indirectly with circumstantial evidence. "Very close" temporal proximity between the protected activity and adverse action, and evidence that the decision-maker was aware of the activity, may suffice. *Montell v. Diversified Clinical Servs., Inc.*, 757 F.3d 497, 505 n.5 (6th Cir. 2014).

Nevertheless, an intervening event may break the causal chain. *Parks v. City of Chattanooga*, 74 F. App'x 432, 438 (6th Cir. 2003) ("[T]emporal proximity alone . . .

13

does not support an inference of retaliatory discrimination . . . [where] discharge is readily explainable on non-retaliatory grounds . . . [not] shown to be pretextual.").

One may infer causation between the activity and adverse action as long as the two events were not "wholly unrelated." *Taylor v. Bd. of Educ. of Memphis City Sch.,* 240 F. App'x 717, 721 (6th Cir. 2007).

### 2. "Cat's Paw" Mode of Liability

In *Staub v. Proctor Hosp.*, the U.S. Supreme Court considered if "an employer may be held liable for employment discrimination based on the discriminatory animus of an employee who influenced, but did not make, the ultimate employment decision." 562 U.S. 411, 413 (2011) (reviewing a serviceman's claim under the Uniformed Services Employment and Reemployment Rights Act). In answering yes, the Court recognized a "cat's paw" mode of liability for wrongful termination. *Id.* at 422.

As described by the Eleventh Circuit,

> One way of proving that the discriminatory animus behind the recommendation caused the discharge is under the "cat's paw" theory. This theory provides that causation may be established if the plaintiff shows that the decisionmaker followed the biased recommendation without independently investigating the complaint against the employee. In such a case, the recommender is using the decisionmaker as a mere conduit, or "cat's paw" to give effect to the recommender's discriminatory animus.

*Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1332 (11th Cir. 1999).

If a supervisor with retaliatory animus recommends termination of an employee, and this causes the employee's termination, the employer may be liable even if the decision-maker acted without animus. *See Staub*, 562 U.S. at 422 ("We therefore hold that if a supervisor performs an act motivated by antimilitary animus that is *intended* by

the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable under USERRA.").

Pre-*Staub*, the Eleventh Circuit concluded that, when a decision-maker conducts its own investigation into grounds for termination that are recommended by a subordinate and renders an independent judgment, the decision is freed of any taint in the subordinate's recommendation. *Stimpson*, 186 F.3d at 1332 (deeming a three-day hearing at which a city police board considered evidence and the plaintiff was allowed to put on a defense to preclude a finding of causation under a "cat's paw" theory).

### D. Pretext

A plaintiff may show that an employer's proffered legitimate, non-retaliatory reason for termination is a pretext for retaliation. Doing so requires "either (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate his discharge, or (3) that they were insufficient to motivate discharge." *Tisdale v. Fed. Exp. Corp.*, 415 F.3d 516, 529 (6th Cir. 2005).

### V. DISCUSSION

Wilbanks has not shown that the school board's decision to terminate him was causally connected with any retaliatory motive or that it was pretextual. While Wilbanks has pursued a theory of liability based on retaliatory animus in Rose's act of referring the two incidents to Wood for investigation,[7] which led to the recommendation and

---

[7] Wilbanks says in passing the school board was on notice of his protected activity because of the October 20, 2015 e-mail, but does not explain the relevance of this. It was not the school board that decided to initiate an investigation or bring charges of termination, but administration officials. The board was the arbiter.

15

termination by the board, he has not established that the board's decision was motivated or tainted by retaliatory animus.

The record supports a finding that the school board conducted an independent investigation of the incident by viewing the videos at its meeting. Wilbanks admits the videos were shown with counsel present to defend his actions, (Doc. 17-3 at 76, 83-86).

The video depicting Wilbanks's encounter with PH established that Wilbanks used force against a student, PH. After being warned by Rose against doing this, the video of Wilbanks's encounter with DH weeks later established that he did so again.

Wilbanks received adequate notice of the meeting by the letter from Wood with the charges and meeting date a week ahead. (Doc. 17-13 at 2). Wilbanks's counsel knew from this letter of the opportunity to file papers, call witnesses, introduce evidence and question Rose, (*id.*; Doc. 17-3 at 85). Counsel did not take advantage of this opportunity.

Whether or not Rose's acts were motivated by retaliatory animus toward Wilbanks is not the issue. The school board's decision was an exercise of independent judgment. The process afforded Wilbanks freed the decision of any taint by Rose.

The Court will not disturb the school board's decision.

SO ORDERED.

S/Avern Cohn  
AVERN COHN  
UNITED STATES DISTRICT JUDGE

Dated: July 27, 2017
      Detroit, Michigan